Appeal number 2008-1005, SKF USA v. United States All right, before we begin, we have a number of issues to be addressed and a number of issues to be addressed. I would like to assist counsel in sorting all of this out. What we would like you to do is to begin by addressing the statute of limitations argument, and what we'd like to do is give each side five minutes to address that issue, and then we'll restart the clock for the balance of the time, 15 minutes on, in effect, both sides to address the merits of the Equal Protection and First Amendment and such other issues as may be relevant. Is that agreeable? Yes, Your Honor. All right, very good. Well, let's begin then. I don't know who's going to begin the argument on the appellant's side. Good morning. Good morning, Your Honor. May it please the Court, Patrick Callagher on behalf of the United States International Trade Commission. In the interest of having government speak with one voice on the constitutional questions raised in this appeal, with the Court's indulgence, the Commission will defer to the Department of Justice on those issues. Instead, I would like to limit my presentation to the issues raised by the time of this question. Simply put, the lower court did not have jurisdiction here at SKF's appeal. In this appeal, SKF challenged the Commission's decision that SKF USA was not a supporter of the petition. When, according to you, did the cause of action accrue? The cause of action accrued, Your Honor, with the publication of ADP list August 3rd, 2001. Not with the passage of the statute? Not with the passage of the Berman? That's not our position, Your Honor. That's Timken's position. Okay. So, with the publication of the list in 2002, did you say? 2001. August of 2001. Okay. So, at that time, I'm having trouble understanding how the cause of action to get the money accrued at that time, because they could not have sued for the compensation at that point, because nobody would know how to calculate it, right? There would have been an estimate. SKF would have been aware of an estimate about how much money would be available, or how Wait, but first of all, you don't know how much is going to be in the pool, and second of all, you don't know who's going to claim or what the proportions of qualifying expenses are for each claimant. So, it doesn't seem to me that at that point, you could possibly sue for the money, because there's no way of calculating the money. That's correct, Your Honor, but in this case, SKF's claim isn't about the money. SKF's claim is that the petition support requirement in the statute is unconstitutional. They're asking for the money. And they're only asking, I'm sorry, they're only asking for the money in 2005. Yes, Your Honor. But the determination about whether they have met the threshold eligibility to be considered to get the money. Well, that's an issue in their claim. That's an issue in their claim for the monies that they contend they are entitled to receive in 2005. Yes, Your Honor, but that decision, the decision about their status as a petition supporter or not a petition supporter was made in August of 2001. That's when their claim first accrued. That's when they knew or should have known that they would never receive BIRD monies. Could they have filed a claim for monies then? In August of 2001 is when the, yes, that's when the note, when the original list. They could have filed a claim for monies for their share of some of these funds? August of 2001 is when Customs announced that pursuant to the statute, the statute requires the commission to make a decision. But how could they sue for the money then? Nobody would know how to calculate. Yes, Your Honor. But as a threshold. It sounds to me as though what you're saying is that they had to break their lawsuit up into two parts. In 2001, they had to sue on the constitutional issue, I guess as a facial challenge. And then in 2005, when the amount of money available was known, then they had to bring a second suit to get the money. Well, no. Is that not true? No, Your Honor, it's not true. That would be a hard decision. How could they bring the whole suit in 2001? That's the problem. The whole suit could have been brought in 2001 because they will never be eligible for any particular fiscal year. Customs does it by fiscal year. So 2001, 2002, 2003, 2004, they got around to it in 2005. But they were never going to get money in any of those years because they didn't meet the threshold requirement that they were a petition supporter, which the commission made in August of 2000, which was announced in August of 2001. Well, they may have never met the threshold conditions, but their claim did not accrue until they were at a point where they could make a demand for some monies and challenge their qualification. But the basis of their claim goes back to their constitutional argument. That is the basis of their claim in this case. They're not saying I did or didn't get money for a particular period. That's not their claim. Their claim is, I don't qualify for money in a particular period. The reason I don't qualify. They do seem to say that their claim is they want the money for 2005, right? Had they asked in 2001, we could have done this years ago, Your Honor. But the real issue for us, the commission, is when did the claim first accrue? The claim first accrued for the very first time when the commission made a determination under the bull bearing order with respect to SKF that it was not a petition supporter. And given that it was not a petition supporter, it would never get money for any particular year, no matter how much there was or how little there was, or how it was calculated. They simply did not qualify. When you say make a determination, there was actually an affirmative act? Yes, Your Honor. In that period of time? Yes. Yes. And the statute provides at 1675 C, D1, that the commission make that determination and then transmit that list to customs for implementation in each particular fiscal year based on their qualifications. I'm not sure. I think I ran over. You are over your time. So let's hear from you. First it was winding down. Now it's winding up. I wasn't sure what was happening. Yes. That's a little confusing. Not a problem. Thank you very much. Thank you, Your Honor. All right. Who's going to argue the point on the other side? Thank you, Your Honor. My name is Herbert Shelley. I represent SKF USA. We have several points with regard to the statute of limitations. First, we need the court to remember that this is a constitutional issue, that harm came with the violation of freedom of speech in 1989 in response to the question in the ITC questionnaire. When the CDA SOA was passed, the statute violated that fundamental constitutional right. And it's the violation of the right that is the real harm to SKF. Each year that the Customs Service now distributes money to Timken or other domestic producers, that And the fact that it's a continuing violation of a constitutional right is what gives us jurisdiction here. You're right. On the factual issues, when the statute was enacted, when the ITC published its initial list, that wasn't a final determination on the facts either. There's an agency decision made by the ITC in interpreting that statute and determining who actually qualifies. There are situations outside that are not governed by the terms of the statute as to who will qualify, such as trade association members. There's an ITC decision as to whether individual members of the trade association could qualify for distributions. There are situations in which the Shea-Sydney situation specifically, in which Shea-Sydney initially, there's a preliminary ITC questionnaire that asks this question, indicated support for the petition. In the final questionnaire, they indicated they did not oppose the petition. The ITC made an agency action to determine that's the second questionnaire response that governs whether you qualify. At the time, every year a distribution comes up. There is no guarantee that there's going to be any money distributed. There's no indication of how much is going to be distributed. There's no indication of who's going to qualify. But our basic point is that we're injured every year because this statute and the application of this statute violates SKF's right to freedom of speech based on speech that occurred in February of 1989. There's something I agree with you in just going forward. Sand and gravel and bulls are the two cases that you're being relied on. Sand and gravel and bulls for the proposition that the 2636I is jurisdictional rather than a conventional statute of limitations. How do you distinguish those two cases? 2636I is the statute of limitations for 1581I, which is the residual jurisdiction statute for reviewing the administration enforcement of the anti-dumping law outside of the context of reviewing the subsidy of anti-dumping determinations. The CIT, citing Mitsubishi Electric in this court, has found 2636I to be not jurisdictional. It's different from the jurisdictional statute that applies to the Tucker Act. In the Tucker Act, you're suing the government for monetary damages for something the government did and that statute of limitation is incorporated into the process of those determinations. Under an anti-dumping case under 1581I, you're suing the government because of the way they administered the law. The 2636I provision is not a jurisdictional prerequisite. It's a time limit that is given under the APA Act for challenging the administration of the law by the Commerce Department of the International Trade Commission. We would argue that this is more like an administrative statutory provision under 1581I, unlike the situation in the Tucker Act. Therefore, it's not jurisdictional. Because it's not jurisdictional, both the ITC and Temkin should have raised this as an affirmative defense before the lower court. They didn't do it. They've raised it now in this case. On that basis alone, there ought to be jurisdiction in this case. Thank you very much. I appreciate you staying within the time frame. All right, we'll reset the clock to 15 minutes and we'll proceed with the argument on the rest of the merits of the case. Morning. Morning, Your Honor. May it please the Court. Franklin White for United States Customs and Border Protection. Are you the only one for the government who's going to speak to the constitutional issue? Yes, Your Honor. The Court of International Trade, in our view, plainly erred in its application of the rational basis test, one which is one of the most deferential tests in the law in holding that the CDSOA support requirement violates the Fifth Amendment equal protections. It's clear that that decision was an example of the court overstepping its bounds and second-guessing determinations which are really left for the legislature to decide. Let's assume for the moment that you convince us about that. You've still got the First Amendment problem in this case. In the First Amendment problem, it's a different standard of review. The first thing we have to do, it seems to me, is to figure out what the real purpose of the statute is, not some hypothetical purpose. And the purpose of the statute seems to be to reward people who bring these anti-dumping petitions and those who support the petitions. There's not necessarily anything wrong with that. I mean, in the key TAM area, you reward people who bring false claims actions on behalf of the United States and things like that. If we look at it as sort of like a key TAM action, help me understand how these proceedings work. The petitioner does the government a favor by collecting the information and saying, these people are dumping, here's information to support that, correct? Yes, Your Honor. Well, the purposes could be seen in the way that you're suggesting, but as we've pointed out in the briefing and as the government's made in the arguments regarding the equal protection analysis, is that this statute or the purpose of this classification should not really be seen as one of rewarding. Well, let's assume that hypothetically we do look at the statute as rewarding the petitioners and the people who support them. Let's assume that that's the idea, that it's not just to compensate the most injured people. So go with me on that. The petitioner helps the government by identifying the dumpers and providing information. And in order to file a petition, you have to supply a significant amount of information, don't you? Yes, the petitioner is going to provide information regarding the unfair trade practices committed by its foreign competitors. The ITC, as part of its neutral investigation, obtains information from various other parties involved, and as part of that is requesting that other members of the domestic industry indicate by checking a box whether they support that particular petition or take no position or oppose that. Well, as a practical matter, what do the people, I understand the burden that the petitioner takes on of identifying the dumping and supplying significant information to the government as to what's going on here. What role in these proceedings do people who support the petition play? Do they help the government? Are they just sort of standing on the sidelines? What role do they play in the proceedings? Part of the ITC's mission and its statutory obligation, which stems from various international trade agreements, is that there is a requirement that there be found a material injury to an industry, and that's not to the petitioner alone. So the purposes of the support question in the ITC questionnaire is in part or perhaps wholly to comply with its statutory mandate. But I understand that, but that's not really my question. My question is if you support the petitioner in these dumping proceedings, what assistance do those people supporting the petitioner usually provide to the government in the course of the proceedings? Do they supply additional information? Do they incur particular expenses? I mean, what's the role of a supporter of the petition? Well, part of it is simply to, as far as I understand, part of it is simply to satisfy this requirement, as I've been pointing to. But as far as providing additional information in supporting the arguments made by the petitioner, I suppose that that does happen on a case-by-case basis to a greater or lesser extent. Aren't the questionnaires sent out to an array of members of an industry, and those questionnaires call for answers to all sorts of things and information on all sorts of things, and that the one question, do you support or not support or take no position, is simply one of the many pieces of information provided by all of the recipients? Correct, Your Honor. There's hundreds of pages. These are very extensive questionnaires. This is one question on the questionnaire. So those parties that don't support the petition provide the same information as those parties that do. They're required by law to respond to the questionnaire in the same way that those who have answered the question checking support are required to do. So certainly there's no... Who determines who these companies are? Is there a list that is maintained by Commerce of members of the industry, and are these questionnaires sent out to all members of that industry? I'm probably not prepared to answer that question in enough specificity for Your Honor, but this is a matter of both the Department of Commerce and the ITC in conjunction. They perform different roles in determining when an anti-dumping or countervailing duty order is going to be issued. When a petition is filed for relief from unfair trade practices, there is a petition that's filed both with Commerce and with the ITC at the same time. What I'm trying to get to is the point that my colleague Judge Dyke is raising, and that is, is there something different that parties who support the position provide to the government as compared to parties that don't support the position? Not that I'm aware of. I don't think that that is an important distinction between why this is a rational classification. The fact that those parties who have responded to a questionnaire, as are required to, have provided some information to the government that serves this purpose. The key word I think we're getting at is required. Is there a compulsory aspect? When you say required, do you mean simply do your best? No. The ITC has the ability to require through subpoena responses to its questionnaires. This is an important government function, which is, like I've said, part of their statutory mandate of determining whether there is sufficient support within a particular domestic industry to go forward with anti-dumping or countervailing duty order. If you say to somebody, look, if this petition succeeds and there's dumping here, you'll get some money, doesn't that encourage supporters of the petition to go the extra mile and try to provide more information and to conduct a greater in-depth investigation of the dumping and thereby assist the government in that respect? Well, for one, to answer that question, Your Honor, to suggest that there is automatically a pot of money at the end is really 20-20 hindsight. At the time when these investigations are initiated and, in fact, most of the dumping orders at issue that are affected by this. No, but what I'm asking for is a practical understanding of how these proceedings work. And is it not the case that the commission relies on private parties here, just as it does in the 337 area, to supply information? After all, the government has limited resources and it seems to be appropriate. And, in fact, the reality is the government relies on private parties to do a lot of the spade work for it. Correct? Yes, Your Honor. I mean, I certainly will have to say that the informational purposes of what the government obtains from the questionnaire responses is the same for those who support it and thereby are eligible under the classification, the CDSOA, to receive these funds, and for those who opposed or took no position. So they are also aiding the government in a government function in that respect. Certainly that is true, but as a matter of whether that changes this classification from one which is constitutional to one which is unconstitutional, we don't see how that fact influences that. You want us to hold it unconstitutional? Well, our position is that as a matter of rational basis review, which is all this is, all it should be because this clearly doesn't involve content discrimination on speech, that it was conceivable and, in fact, easily apparent on the face of the findings of Congress that preceded the CDSOA's DeWine and Senator Byrd that this was intended to be a remedial statute that was going to aid members of domestic industry that had been continued to be injured by dumping and subsidization. That may be all well and good, but the question is if there are First Amendment implications here, then maybe a different standard applies and strict scrutiny might be the standard and not rational basis. Certainly the court below didn't address any of that and, of course, the court here has, within its discretion, particularly as it's been briefed by the parties, to decide the First Amendment question. But as a matter of First Amendment law, before you get to the question of strict scrutiny, you have to have some sort of statute that has a speech, some burden on speech. If there were a prohibition here, if there was a prohibition on people opposing anti-dumping petitions, that would be unconstitutional, right? No question. Yes, Your Honor, but that's not what this... But the question is, does it make a difference that this is just a subsidy to the people who do the petitions and support the petitions? Does that make a difference? It makes a difference that the statute itself... It does seem to be rewarding people who take a position favorable to the government. There is nothing in that statute, Your Honor, that indicates any attempt to reward parties as opposed to provide a subsidy to American manufacturers who have been injured. Well, except on the face of the statute, that's what it says. It says we're going to reward you if you're a petitioner or you support the petition. It seems to reward the position that you're taking. Well, it would have otherwise perhaps used the phrase favored producers. Here, by talking about affected domestic producers, it appears that the statute, in keeping with the findings of Congress and whatever little legislative history there was on the floor regarding what the intent was, was to aid a certain class of domestic manufacturers and not all of them. That's different than a reward. And to suggest that by using this checkbox of support versus oppose, that Congress intended to reward a favored viewpoint, which is the ultimate test that has to be applied before we can ever get to the question of strict scrutiny. Let me put it this way. If the rational basis, and the one I understand that is being suggested, is that a party who answers the support question affirmatively is demonstrating by that answer that it's suffered greater harm than someone who doesn't. If, going back to what I asked earlier, everyone has to supply the same information and can be compelled to do so, what does the answer to that question tell me in terms of the actual harm being suffered by those who do? Well, as a matter of economic logic, as we've been pointing to in the briefing, it is rational for Congress to believe that those parties who, when asked that question, a petitioner has come to the ITC requesting a remedy for a harm. I've been harmed by continued dumping and subsidization. Those who either petitioned for that relief or supported the petition for that relief should be presumed, as a matter of economics and that firms are going to pursue profit and are going to be thinking about the bottom line, that they would be more harmed than those who opposed or took no position. That seems fairly uncontroversial. In fact, in the Shea-Sydney case, the court there essentially conceded that, as a matter of rational basis review, there is a high correlation. Well, that works fine on a rational basis. The problem is it doesn't work on the First Amendment. The First Amendment requires us to look to see what the objective of the statute is. On the face of it, it seems to be a reward statute for people who file petitions or who support them. And we're trying to figure out whether, as a reward statute, it can be sustained. Well, Your Honor, I see that the time is ending. We were intending to split the time. Just go ahead and answer Judge Dyke's question, and then we'll address the time. Well, certainly, I understand where Your Honor's questions are directed to, and clearly, as a matter of First Amendment law, our responses of, there is a rational basis and there is an economic logic to this classification, aren't enough. And I accept that. But as a matter of First Amendment law, there has to be content discrimination or viewpoint discrimination involved in the statute. There is no way to look at the statute. Well, it's on the face of it. They're rewarding the people who favor the government's position and not rewarding the people who don't. Well, you've characterized it as a reward, Your Honor, but the statute does not actually use the word reward. It does use the phrase affected domestic producers, which we say suggests, in keeping with the statute and the findings and what was said about the purpose for this was to aid those producers that were seen as being more harmed than others. And the fact that they received these benefits and that the other parties who have also aided the government in anti-dumping investigations by responding to questionnaires but who opposed the petitions do not receive that doesn't involve any sort of speech or content discrimination in what the government's purpose behind this is. After all, the ITC's investigations are completely neutral. It's a non-political, non-policy-making body whose function is to do essentially a quasi-judicial function of determining whether domestic industry has been materially injured. Is there any final point you'd like to make before your colleague? No, Your Honor, unless the court is... Thank you, Your Honor. Thank you very much. And since we've used up most of your time with our questions, we'll restore two minutes of rebuttal and we'll add five minutes to hear from Professor Kimmick. If it pleases the court, I'm Doug Kimmick here for Timken Company. I'd like to respond to the court's questions on the First Amendment issue. This is not a First Amendment case, and the way I think to understand that is to recognize that the survey requirement where the request for whether you're a petitioner  of the passage of the CDSOA, that survey took place in 1988, 1989, well before the enactment of the statute. So the two things were not originally linked, and in fact that goes a long way toward explaining how you can easily get lost in this case because when you hear the language, do you support something, it sounds like you're asking for somebody's opinion, and it sounds like the government is indeed asking you, are you in favor of us? Are you on our side? When, in fact, that's not what the survey requirement is about at all. It originates from the obligation of the part of- The survey requirement that we're addressing in constitutional terms, it's the statute which gives money to people who petition or support the petition and doesn't to those who don't. The question is whether is it appropriate to reward people, give a monetary reward to people who petition or support the petition. In the manner in which you ask the question, the First Amendment would say no because if you hold out money and say, if you agree with me, you can have the money, that's the quintessential unconstitutional condition, but that is not what this is because the inquiry as to support is not with respect to a particular government point of view or it goes back to an obligation to determine whether as the petitioner comes to the commission and says there has been a material injury to our industry. Are QTAM statutes constitutional? I believe they are. Under the First Amendment. I believe they are, but I also believe the QTAM statute has a very unique history which has been separately litigated on that question and I don't believe we need to rely upon them for this purpose. But you may not rely on them, you may not need to rely on them, but why isn't this sort of like a QTAM statute, at least as to the petitioner who is being asked to collect information, to spend a considerable amount of money doing that, to ferret out people who are engaged in dumping. What's the matter with rewarding people who perform that sort of assistance to the government? I think the petitioner initially comes to the Department of Commerce and does public service by saying there is foreign dumping, illegal dumping occurring which the Department of Commerce needs to address. And that may take a considerable amount of effort to do that. A considerable amount of time, effort, and expense. Also goes to the Interstate Commerce Commission and says there is an injury not just to me but to the entire industry. But that then raises the question, here is one firm who has gone through enormous expense, as you say, and effort to bring that to the government's attention, but the government then has the obligation out of its international agreements to determine whether or not that petitioner is there alone or whether he in fact represents the entire industry. And so the origin of the support requirement is not a support requirement that inquires as to a particular point of view, but it's basically a standing requirement. Does, in fact, the petitioner represent the industry as a whole? The government is trying to ascertain whether, in fact, the petitioner is by himself in terms of his complaint or whether, in fact, there's a major injury for the industry in its entirety. What you're saying is if the only way we could sustain this statute under the First Amendment is by analogy to QETAM statutes, you'd say that you'd lose. You're giving that up. Well, I'm saying it's not necessary because... Suppose we decide that it is necessary. Do you win or lose? I think if you're analogizing the... says that, in fact, the government can have a neutral interest in providing a subsidy to someone who does a service for the United States of America and identifies fraud, waste, and abuse when others wouldn't do it. And that's independent of any point of view that the government may have. Instead, it's just the objective is the fair administration of the law, and the good citizen has done it. And that QETAM analogy clearly supports us without implicating any First Amendment analysis. But if others are being required to come forward, too... Yes. ...and support the same complaint, and yet some are being rewarded and some not and having a hard time following the petition you're drawing, you're not suggesting that trade policy is not government policy? No, I'm not suggesting that, but I am suggesting, Your Honor, that there is no particular point of view that the government is trying to impose upon anybody in this transaction. They're basically conducting an investigation. Has there been foreign dumping? Has it resulted in a major injury, a material injury to the industry? And then, when that requirement is then transferred over to the CDSOA, asking, in the event that the harm continues, that the order that has been issued hasn't brought to a stop the illegal practices, who's the person that, in a QETAM-like fashion, without regard to a particular substantive perspective, who's the person that we need to subsidize to help maintain the playing field as against this illegal foreign practice? Do you have any final point you'd like to make? Well, I think my final point is, as I began, that there's a bit of a head fake, to use the terminology of the sport, that goes on with the language of, do you support something? Because that suggests that you're asking for an opinion. But if you put it in the context of the origin of that requirement, it is instead a pursuit of factual information as to whether or not this person actually is part of the entire industry that has been harmed by the foreign practice. And therefore, the First Amendment is not implicated. Strict scrutiny is not required. And as my colleague from the Justice Department indicates, there's more than an ample rational basis to find a relationship between the status of a petitioner and a supporter and the purpose of this statute. All right. Thank you very much. Thank you, Your Honor. We'll hear from the other side. And let's set the clock at 25 minutes to start, to even the playing field a bit. Thank you, Your Honor. I don't know where to begin. First of all, the rational basis argument. This Court has the authority and should decide this case on a strict scrutiny basis, despite what the lower court did. These issues were thoroughly briefed. First Amendment, equal protection based on a strict scrutiny analysis before the CIT, and they've been briefed here. And the appropriate standard review for you to apply to this case should be strict scrutiny and not rational basis. To clarify a little bit about the anti-dumping questionnaire, it seems to be a little confused. When a petition is filed by a member or several members of the domestic industry who – Before you get to the questionnaire, you agree, right, that a petitioner in an anti-dumping proceeding is doing a substantial amount of work to advance the anti-dumping laws, trying to identify people who are dumping, supplying information. The contents of the petition isn't just a pro forma thing. You have to do quite a bit of work, right? There is substantial work to be done, but it's really the equivalent of presenting a prima facie case that there is sufficient evidence to go forward. Okay, so as to the petitioner, what's wrong with rewarding – what's wrong with the government rewarding somebody who does that amount of work to vindicate the public policy in the anti-dumping? Because an anti-dumping order is not issued based on the petition. An anti-dumping order is based on analysis of the entire domestic industry, both in the Commerce Department, whether there's dumping, and the International Trade Commission. I don't understand that answer. If the petitioner is doing a lot of the work, it may not be sufficient. It may be that additional work needs to be done, but why can't the government reward somebody who initiates this proceeding? Put aside the supporter issue, which is difficult. But just talking about the petitions, what's the matter with rewarding somebody who goes to this extent of doing this work at considerable expense and providing the information to the government so that they can decide whether to initiate an anti-dumping proceeding? There would be nothing wrong with that, Your Honor, if the statute were drafted in a constitutional manner. But the way this statute's drafted to reward the petitioner or the supporters is done in an unconstitutional manner. So the CDSOA is not written in a way that supports the petition and would give that kind of benefit to a petition. The CDSOA is written in a way that requires a viewpoint be expressed, the International Trade Commission, on an opinion of whether they support the case or not. So in theory, there would be no harm to that, but that is not what the statute has done and that's not what happens in an anti-dumping proceeding. So in theory, it would be consistent with the First Amendment to reward petitioners who bring anti-dumping proceedings. The theory would be if the statute had been written that way, but the statute did not. If it were written to do that, it would be okay. If it were written that way, it's not so good. This statute could have been written differently and we wouldn't be here today, but they wrote it in a way that's unconstitutional. But if it were written the other way, it would be okay. I would have to say I was worried, Your Honor, to make a public decision, but I would argue that it shouldn't be just the petitioner getting a reward from having filed a petition because there is substantially more work done by all the members of the domestic industry and foreign companies that have to go through a year-long process submitting substantial data on finances, shipments, production, economic status of the industry. There is tenfold the amount of work done in determining whether to issue an anti-dumping order than in putting together the necessary facts to file a petition. Isn't your answer to Judge Dyke that, well, no, no, there's a difference here because the petition, regardless of how much time, effort, and work goes into a petition, is not for the petitioner's benefit. It's to set forth information regarding injury to an industry. That's correct, Your Honor. And the petition also has to represent the industry. What's the matter with rewarding somebody who does that? I didn't say there wasn't, Your Honor. I just said that the statute is not written to do that. The statute is written to remedy injury to a domestic industry. And if the statute, the CDSOA, had amended the anti-dumping law to reward petitioners based on their having written a petition and gone through the expense of doing so, then they could have been rewarded. But isn't that what the Byrd Amendment did? No. The Byrd Amendment may have started out differently, but that's what the Byrd Amendment did. What the Byrd Amendment ended up doing is discriminating among members of the domestic industry based on a private viewpoint. The Byrd Amendment theoretically from, and this was a statute that never went through the legislative process. It was inserted in an appropriation bill in the middle of the night. It was a political statute aimed at protecting a constituency in West Virginia. The Byrd Amendment was intended, according to the arguments of counsel, again, it's not in the statute or any of the legislative features, it does exist, to reward those most harmed by the dumping and the continuing dumping. That was the government purpose that's found out, that's elicited in the statute. But to determine who receives that benefit and that subsidy, the question is asked, based on an ITC neutral question, not having to do with facts to determine whether there's an injury, but the question that SKF asked in the ITC questionnaire was, please indicate, by checking the appropriate box, the position that your firm takes with respect to the petition. That's not a factual question. But that response, based on whatever views a company has to answer yes, no, I oppose, I support, irrespective of an economic consideration with regard to this, companies have other reasons for answering that question, oppose, that have nothing to do with this case. That question asks for a private viewpoint. It's a mandatory response to a US government question, and that private viewpoint triggers whether there's a viewpoint that would express the freedom of speech situation. It's that question and the response to that question that triggers who receives distributions under the Red Amendment. Just for my own information, back in 1988, what was the purpose of asking that question? The question's been in the ITC questionnaire forever, and I think the purpose gives an indication, again, to meet the statutory requirement to have enough support within the industry to go forward with the company. 25% requirement. Right. Timken doesn't meet that. Timken wasn't even around then. It was Torrington then. The ball bearing industry is a fragmented industry. To even get 50%, you had to have my client's US production in there because they're the biggest US producer of these things. There wouldn't have been enough support. That question is aimed at identifying who supports the industry to meet this 25% criteria. If they find that there may not be sufficient support, the Commerce Department can poll the industry to determine who might support it or what. But the answer to that question is not based on whether you want the case to go forward. It's based on a viewpoint. SKF is an international company that believes in free trade. Many companies don't believe there ought to be an anti-dumping law. That's a perfectly legitimate viewpoint to have. Saying that viewpoint and responding to the question in that manner, because of a decision having nothing to do with the anti-dumping case that's going to go forward, is a right that they have under the Constitution. By now benefiting their competitors under the Byrd Amendment and the provisions, based on their viewpoint, their private viewpoint, it's an unconstitutional law. I want to go back to your vision of a constitutional version of the statute as you see it. What if the statute had been written to say that the government may, amongst all those who complain, the petitioners, select those it thinks most worthy in the sense that they will be the most cooperative, the most enthusiastic, and the most helpful. Is that the case with that statute? I don't know if that's a subjective question. I think a more direct question would be if the ITC were to determine, based on the information they received in their questionnaire responses, these companies look like they're really being harmed, they're in much worse financial shape than these U.S. companies are, that might be a legitimate standard or basis on which to differentiate among domestic producers. Your question is a little more subjective and it could possibly lead to interpretation of viewpoints that may or may not be supportive of the Constitution. Let me try to pursue this question. Suppose the statute said we're going to reward the people who are most helpful to the government in pursuing these anti-dumping proceedings by supplying information and identifying people who are engaging in dumping. Would that be permissible under the First Amendment? I don't know if it would, Your Honor, because I think you'd still have to look at the statute. It's a criteria that's not necessarily indicative of a private viewpoint. You have to get away from the criteria, a criteria that requires a company to express a viewpoint in order to receive a reward. That situation, if there are firms that go through the process of putting together the data necessary to initiate a case, then they have taken a concrete act to go to that point. Again, that's not what's happened here. Then you'd be rewarding the conduct rather than the opinion, right? We're rewarding the effort taken by the conduct. There's something that is not a constitutionally protected right. And in making that criteria known up front, that if you support the petition by giving the necessary data to have the case initiated, that is something that could be considered as an indication of perhaps greater harm and therefore meet the alleged justifications for the statute. But again, that's not what the CDSOA did. It based its rewards on a viewpoint taken that has nothing necessarily to do with the investigation. Just to get to a couple of points about the other, Professor Chemek said that this isn't a speech case. Well, it is a speech case. This question is protected speech. It requires, the U.S. government requires that you respond to their questionnaire. You have to respond honestly to their questionnaire. And you are, based on that, just responding to a questionnaire, a question expressing the viewpoint required by the U.S. government. Also, the viewpoint... For the benefit of your co-counsel, I just suggest you take a look at the clock as to where you are and gauge your time accordingly. I will, Your Honor. Thank you. I'm not telling you to stop. I appreciate it. If you go through each of the criteria, it's protected speech. It was mentioned that the ITC is a neutral agency. It is a neutral agency and has to make a neutral, impartial decision in these cases. But trade law is a political statute. And the ITC, every time it issues a determination and in any dumping case affects foreign U.S. policy because our foreign trade partners retaliate against the U.S. government based on ITC decisions if they think it's inconsistent with our international obligations. It is a political... The whole aspect of this is political. Also, this case requires that a company like SKF express a viewpoint in the context of a public forum. The ITC investigation opens a public forum in which certain parties are mandatory respondents and have to respond. It also opens up the investigation to congressmen, consumers, non-participating respondents, to give their viewpoint on the limited aspects of that proceeding. So, again, you cannot discriminate based on viewpoint in the context of a public forum. Every aspect of the way the CDSOA viewpoint provision was written is a constitutionally unconstitutional provision in violation of SKF's First Amendment rights. If there are no more questions, I'll turn it over to Mr. Schor. Thank you. Mr. Schor, good afternoon. Good afternoon. Michael Schor on behalf of Amici, Georgia Foods, and Chase Sydney. I want to start with the key TAM question because I think it's an interesting analogy but an inappropriate one. I want to clear up a misconception. The United States government is neutral in anti-dumping cases. It doesn't favor them or disfavor them. The petitioner that brings a case is not in any way assisting the United States. That's not exactly true. We have a statute which expresses a public policy that dumping is a bad thing and it should be corrected. To the extent that it may be neutral in adjudicating whether there's dumping in a particular case, but the United States clearly has an interest in encouraging dumping to be reported and to be prevented. I disagree with that. Under the international agreements to which the United States is a party, private parties have an interest in anti-dumping cases. The relief goes only to private parties. There's no governmental relief. It favors producers over consumers. The government itself is neutral. Why would the government pass an anti-dumping statute if it didn't care whether there was dumping or not? Because it protects producers from anti-dumping. That's a judgment that dumping is bad for producers and that's a public policy determination, isn't it? Maybe we're talking about a semantic issue. The government does have an interest in ensuring that free trade between countries occurs fairly. The government does not have an interest in any particular anti-dumping case and what the result of that case is. It's different from a key time case in that it's not a private party stepping up and pursuing the government's interest in uncovering wasteful waste. I don't understand. Why are petitioners who identify dumping if there is in fact dumping serving the government's interest? The government doesn't like dumping. It wouldn't have an anti-dumping statute if it didn't care. That's like saying the government has federal courts to solve civil disputes. It has an interest in resolving those disputes but the government has no interest in the disputes. It's not just providing a forum. It's also setting the rules. It's saying dumping is bad. Dumping will lead to anti-dumping duties. It doesn't say that dumping is bad. It just says that there will be a remedy if dumping is found. Dumping is not unlawful. Dumping is not unlawful. In this case, the problem with the key time analogy... It may not be unlawful but it certainly can be economically painful. It can be economically painful not to the government and that's the difference between key time cases... Because the government has, by passing these laws, implemented a policy decision that dumping should come with a penalty. A remedy, yes. A remedy. I'm sorry. The court has said that dumping law is remedial, not punitive. I misspoke. I agree with you. But nonetheless, the statute reflects a policy decision as I think Judge Dagg correctly asserted. Let me put it this way. Unlike a key time case, the petitioner in an anti-dumping case is not stepping in the shoes of the government and remedying a problem for the government. It is stepping in its own shoes and seeking a remedy for the entire industry. It is more like a class action case than a key time case. They're seeking a remedy for their own harm, not for harm to somebody else. And as a class action, that's the constitutional problem with providing CDSOA benefits just to the petitioners in that they are not acting in their individual capacity. A petition can only be brought not by petitioners. It has to be brought on behalf of the industry as a whole. So if you allow the benefits to go just to the petitioners, you're not providing the benefits to the industry as a whole on whose place the petition would be brought. It's just like saying in a class action case the named plaintiffs can recover the full pot of money. That would be unconstitutional. Why would it be unconstitutional to say that the named plaintiff can, in a suit for injunctive and damages relief, that the named plaintiff will get all the damages and that the injunctive relief will go to benefit the class? Why is that unconstitutional under the First Amendment? Not the First Amendment, under the Due Process Clause, because it leaves the other parties without a remedy. There would not be a First Amendment problem in that case. Yes. The other thing that's important to keep in mind here with the key terminology is that at the time the petition in this case was filed, which was 1989, there was no burden on it. So this was not a petition seeking distribution of anti-dumping duties. This was a petition brought for a different case. And there's still a constitutional problem under the First Amendment in awarding all the benefits in one subsidy to a petitioner who did something else because it still treats the act of not joining a petition, which is a constitutionally protected activity, as a basis for denying benefits. So there is still a constitutional problem if this statute were to have been written to say that only the petitioners would get the benefits. Now, as to the support requirement, which is a different... Can you leave the QUTAM? Often in a QUTAM case, you'll have 20 putative relators who basically bring the same complaint to the government. It's not uncommon, is it, for the government to elect among them to choose the plaintiffs that it's going to support. And isn't the relator in a QUTAM action trying to do the same thing as the petitioner in this context is doing, which is to invoke the machinery of the government to do something that as a private party it could not accomplish? No matter how much you might complain about dumping, you're not going to be able to go out and assess duties or customs as a private party. I don't pretend to be an expert in QUTAM actions. The first I've heard of them was the discussion this morning and what I remember from law school. But I don't know whether the government gets to pick a particular plaintiff, but the analogy is correct. The petitioner is the one who gets the ball started. After the ball gets started, everybody has an equal role. The petitioners, the opponents, and the people who took no position in the domestic industry all get the same questionnaire, all have to complete the same information, and the commission decides whether the industry as a whole is injured, not whether the petitioners are injured. But isn't it possible that someone who is a supporter of the petition is going to put in more effort, go to more expense, in answering that questionnaire than somebody who opposes the petition? Well, with the Byrd Amendment, that's exactly correct, and that's the problem. The Byrd Amendment creates an incentive for people to support petitions and a disincentive for people to oppose petitions and thereby skews the information that the government actually receives. Well, so what's wrong with that? Under the First Amendment, you say that the person will reward you if you support the petition and ferret out any dumping and help the petitioner prove the case, and if you don't do that, we're not going to reward you. That's what the Supreme Court said was the problem in the Velazquez case, in that when the Supreme Court took a benefit provision of funds to the Legal Services Corporation and said you can use the money for all purposes, but you can't use it to advocate a particular viewpoint on state and federal welfare laws, the Supreme Court said that's unconstitutional under the First Amendment because it skews what the neutral decision-maker is receiving. It skews the benefit, it skews the advocacy. They said it's analogous to the limited public forum cases because they're supposed to have a full exchange of viewpoints, and you can't pay people that just support one viewpoint. So the limited public forum cases also create a problem for the government in this case because the ITC is supposed to be a neutral decision-maker. They're supposed to receive zealous advocacy from both sides. People are supposed to feel free to give their honest viewpoint, and the government can't step in and pay one viewpoint and not another. That's the problem with that. There are three questions the court really has to answer under the First Amendment, and they're all fairly easy and straightforward questions. First, is SKF's response to the petition support question protected private speech? The only exceptions to protected speech are things like defamation, fighting words. This doesn't fall within any of those categories. The position that Dr. Kimmick advocated and the government advocates of drawing a distinction between speech that occurred in the past and speech that occurs currently has no support in any case. The First Amendment is not that fleeting. The second question, does the government's action discriminate based on the viewpoint? That's an objective, not a subjective test. The question isn't whether the government can concoct some rationale after the fact that creates a rational basis for the statute. You have to look to the statutory language and its purpose using the traditional tools of statutory construction. What does the statute say? This statute is tied to speech. It's tied to the viewpoint a petitioner or a domestic industry producer expresses on whether they support or oppose a petition. Ask yourself what the limits of the government's argument are. If you accept their argument, the First Amendment disappears entirely in the funding context. If their argument is accepted, the government can say, do you support John McCain for president? If you do, we'll award you a tax rebate. If you don't, we won't because we will assume that since McCain advocates tax reduction, that those people who support him need it the most. That's a rational basis. I guess under the election law, you do get rewarded for supporting a particular candidate. They pay you out of public funding. The candidate does, not the voter. Their position has no limits. Look at what the Supreme Court said in Velazquez. They warned against exactly the argument they're making here, which is that the First Amendment shouldn't be construed in the subsidy context as every argument the government makes is that they will be defining the limits of their program and therefore the First Amendment will be reduced to a semantic exercise. That's really what they're asking you to do. The argument that they advance here is the argument that was rejected by the court in Velazquez. The third question before the court is, does this measure survive strict scrutiny? Nobody argues that it does. It couldn't possibly. The government's argument that this case has nothing to do with speech proves that it can't survive strict scrutiny. They could have tied the benefit to economic criteria. They could have tied it to injury. The measure is not narrowly tailored to serve a compelling state interest. Your argument survives strict scrutiny of the clock. Thank you very much. We'll hear rebuttal. I want to just take one minute of your time, Your Honor, so I can serve. You've got two. Two? Thank you. I think listening to the argument of SKF and Amici in this case, it seems to be, the parties seem to be in agreement that this statute and the classification is really not that similar to the situation of relators in QUITAM cases where they are providing a service to the government and receiving some amount by statute as a reward for having brought to the attention of the government fraud, waste, and abuse. This is a statute that deals with, as I think has been discussed, the private members of domestic industry helping themselves by seeking relief from an independent government agency whose function is to determine in conjunction with the Department of Commerce whether there should be a remedy for unfair foreign dumping and subsidization. If they have, in seeking this remedy for themselves and the industry, they are providing information that the government, in part, is required to receive by statute that was meant to implement international agreements to determine, for example, for standing purposes, whether a sufficient number of percentage of the domestic industry believes there needs to be a remedy to dumping in a situation like this. The purpose of this question is not geared toward any particular viewpoint. It's geared toward the government receiving information that's necessary to pursue the statutory mandate of the particular agency. It's being used as a convenient means after the fact, because most of these orders existed long before the CDSOA, to provide a way of targeting those producers most in need of further assistance. Thank you. Thank you very much. We thank all counsel. The case is submitted.